## HUBERT et al. v. APOSTOLOFF.

(District Court, E. D. New York. September 24, 1921.)

1. **Contracts ⬅⇒267—Right to rescind contract for fraud not barred by non-performance.**

    Failure to perform a contract by a party induced to enter into it by fraudulent representations is not a bar to a suit for its rescission.

2. **Evidence ⬅⇒434(8)—Party not bound by recitals of contract procured by fraud.**

    Where a contract was procured by the fraud of one party, the other party cannot be estopped by recitals therein that it contains the only representations made and relied on.

3. **Contracts ⬅⇒97(2)—Fraudulent contract; failure to make inquiry, when induced by other party, not bar to relief.**

    That a party induced to enter into an executory contract by fraud

proceeded with the contract after knowledge of facts which might have put him on inquiry *held* not to bar his right to relief, where such facts were plausibly explained by the other party.

In Equity. Suit by Conrad Hubert and two corporations against Sergius Apostoloff and another; also two suits by defendant, each against one of the corporate complainants. Decree for complainants, and suits by defendant dismissed.

C. Bertram Plante, of New York City (Herman Aaron, of New York City, of counsel), for plaintiffs.

Borris M. Komar, of New York City (Robert P. Levis and L. E. Schlechter, both of New York City, of counsel), for defendant.

GARVIN, District Judge. Three actions have been tried together by consent—a suit in equity to rescind two contracts made by one of the plaintiffs, Conrad Hubert (hereinafter referred to as the plaintiff) with defendant, dated June 23, 1919, and September 8, 1919, and to compel defendant to deliver to plaintiffs certain stocks and securities received by him pursuant to said contracts; plaintiffs claiming that the contracts were made as a result of fraudulent misrepresentations by defendant. When the action was brought, defendant's wife was made a codefendant, but at the close of plaintiff's case, she was eliminated by consent.

The other two actions are brought by the defendant in the foregoing action against each of the plaintiff companies, respectively, to compel the issuance to him of certain specified shares of stock in each of said companies, which were organized pursuant to said contracts to finance, develop, and market defendant's alleged invention.

This matter first came before the court on a motion by plaintiffs for an injunction pendente lite restraining the defendants from transferring any of the stocks and securities received pursuant to the contracts above mentioned. When that application came on for hearing, both sides filed voluminous affidavits. The court decided that plaintiffs should have the relief sought, and set forth its conclusions somewhat at length, after a review of the facts. After hearing the testimony the court is satisfied that the plaintiffs have established the material allegations of the bill of complaint, not merely by a fair preponderance of evidence, but by clear and convincing proof.

In the fall of 1918 defendant made a contract with the Interstate Electric Novelty Company, granting the latter a license which he had obtained from the United States government to manufacture samples of battery cells, after representations to that company by defendant that he had invented a cell that would last for all time. The negotiations leading up to the execution of this contract were conducted, to a great extent, by Block, the vice president of the Novelty Company, who, in May, 1919, introduced the plaintiff Hubert to the defendant. Then followed a series of representations by defendant to plaintiff— that defendant had invented a new method of construction of a battery for flash lights, applicable to small as well as large cells, by which the elements necessary to generate electricity were kept apart until the battery was to be used, when they would be pushed together; that the life of the battery would be unlimited; that the electrolite, a necessary part

of the battery, would not dry up, but would remain soft; that this condition of the electrolite would be brought about by adding thereto agar-agar, by which, not only would the electrolite be kept moist and pliable, but the zinc cup in which it was contained would be unaffected (ordinarily zinc is injured by electrolite); that he had been making these batteries for several years, having some perfect specimens more than two years old, and that he had manufactured more than 5,000 of them for the Interstate Novelty Company.

In view of the fact that the life of a flash light battery is at most but a few months, it is manifest that such an invention would revolutionize the industry. Plaintiff's interest was at once aroused, and he finally made the contracts with defendant which he seeks to have set aside, claiming that they were procured by the misrepresentations aforesaid. The defendant denied that he made these statements, but they have been clearly proved in whole or in part:

(1) By the testimony of plaintiff and other witnesses, some of whom are disinterested.

(2) By the application for latter's patent, which defendant admitted he gave to plaintiff, and which he admitted that plaintiff read, which application contained these claims:

"A further object of my invention is to provide a new electrolytic mix of a semi-solid nature that will retain its form when moulded, pressed or otherwise formed into a desired shape or mass until forcibly disturbed therefrom; that will retain its semi-solid nature for an indefinite period of time until required for use, and that at the same time will possess a sufficient degree of fluidity to yield and flow freely upon force or pressure being applied to it."

"My electrolytic mix 18 is placed in the bottom of the outer container 12. I form this mix in a semi-liquid state of materials, which include elements which are by nature non-drying, so that the mix will remain in whatever shape it is molded, pressed, or otherwise formed into, and at the same time possess a sufficient degree of fluidity to yield and flow freely upon sufficient force or pressure being applied to or upon it."

"I prepare this mix from the usual salts at present in general use, which I dissolve in water and then add an equal volume of powdered cellite or kisselguhr and from 7½ to 11 per cent. of its volume according to its strength, of agar-agar, mixed or emulsified with one-tenth part by weight of either glycerine or still bottoms produced by the distillation of mineral or petroleum oils; if desired, the agar-agar can be substituted by a starchy powder, or wheat, or other flour, but in this case the compound must be heated up to about 82 degrees Centigrade, when the right consistency and properties are obtained. The above-described mix is poured while still in a fluid state into the bottom of the outer container 12, which has been previously treated to render it sufficiently waterproof and rigid by usual and well known methods. Within a short time this mix will stiffen or become semi-liquid and become sufficiently solid to preserve its form, softness, and elasticity for an indefinite period of time, and yet be sufficiently liquid to easily give and flow when mechanical pressure is applied to it."

(3) By the draft contract dictated by defendant in plaintiff's presence, which referred to "a new ageless and imperishable battery cell." These representations were false, and known to the defendant to be false, were made to the plaintiff with intent to deceive him, and he acted thereon, investing more than $650,000.

[1] It is not necessary to set forth in detail all the relations between the parties nor any further particulars of defendant's device, but the arguments of importance upon questions of law which are advanced

in behalf of defendant should be considered. It is asserted that the right to rescind a contract on the ground of failure of performance by the other party, delay in performance, want or failure of title, insufficient or incomplete performance, breach of conditions or of warranties, or for other such causes, cannot be claimed by a party who is in default in the performance of any of the obligations imposed upon him by the contract, citing Hull v. Pitrat (C. C.) 45 Fed. 94, and Gardner v. The Roycrofters, 197 N. Y. 511, 90 N. E. 1158, and that the failure to permit defendant to have the supreme direction of the works of the manufacturing corporation (the Portable Electric Current Company, Inc., one of the plaintiffs) and to have issued a part of the stock of both plaintiff companies to defendant was a breach of the contracts.

The action, however, having been brought for a rescission of a contract on the ground of fraud, any failure of performance by plaintiffs is immaterial. Even if this were not the law, it does not appear that plaintiffs violated their agreements with defendant, as is asserted. There was no agreement by plaintiffs to place defendant in supreme control of the manufacturing works. The agreement provides:

"The inventor covenants * * * that he will enter into an agreement with the manufacturing company when organized, by which he will undertake the complete and supreme direction of the manufacturing company's works, acting as the fully authorized executive of the same, under the direction of the board of directors," etc.

Nor was there a breach by plaintiffs of their agreement to issue to defendant stock of either of plaintiff companies.

[2] Defendant claims that, when a contract states that it is made under representations therein expressed, other representations cannot be alleged, in the absence of proof that a party to it was deceived as to the contents of the contract, or otherwise prevented from ascertaining the same. It has been decided that the contract is void because it was procured by defendant's fraud; it follows that plaintiff cannot be estopped from setting forth the truth by anything contained in the contract itself. Strand v. Griffith, 97 Fed. 854, 38 C. C. A. 444, and cases therein cited.

Defendant claims that the evidence shows that in June, 1919, he honestly believed and had a right to believe that his invention was practical, notwithstanding the fault developed by the samples made. An examination of the record discloses that the defendant represented that he had ascertained, after a long experience with the invention, that the electrolite would remain soft and pliable, and would have no injurious effect on zinc, whereas he had ascertained nothing of the kind.

It is also asserted that plaintiff used a mix meter and monocell which defendant claims to have invented, and for which he (defendant) made application for letters patent. As the applications for letters patent to both of these stand in defendant's name, he is fully protected with respect to any rights he may have therein.

Defendant further contends that, since plaintiffs attempted to rescind the contracts, the firm of Williams & Pritchard, patent solicitors, have taken various legal proceedings in connection with the foregoing and other applications for patents. Whatever this firm did was

rather to attempt to keep the applications in statu quo, and as the plaintiff gave instructions to take no action, except to keep the applications unchanged, he discharged his duty in full.

It is urged that plaintiff knew or could have known that the representations were untrue, either before or after June 23, 1919, but that nevertheless he continued his relations with defendant. This is in reality an attempt to invoke the doctrine of caveat emptor. A discussion of the principles here applicable is found in the case of Strand v. Griffith, supra.

In the case at bar the representations were of facts of which plaintiff had no knowledge, and concerning which the ordinary individual would have no information. If plaintiff had undertaken to make a full investigation, before accepting defendant's representations as true, the element of reliance by plaintiff upon defendant's statements would be lacking. If the contract is executory, and the defrauded party thereto, after ascertaining the facts, proceeds with the contract, he cannot rescind. But here there is no evidence that plaintiff discovered that the representations were fraudulent until after defendant had withdrawn from his association with plaintiff.

[3] Defendant contends that plaintiff had facts brought to his notice which would put upon inquiry the man of ordinary prudence. The difficulty with this claim is that, when plaintiff spoke to defendant about these very facts, defendant offered a plausible explanation, so that plaintiff's failure to terminate their relations is excusable.

The other points relied upon by defendant are either without merit or have been hereinbefore determined adversely to him.

There will, therefore, be a judgment according to the prayer of the complaint in the action against Apostoloff. The two actions brought by him are dismissed.